**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**
-------------------------------------------------------------x
SEAN STALLINGS,

                       **Petitioner,**                     **MEMORANDUM AND ORDER**

       **-against-**                              **04 CV 4714 (RLM)**

R. WOODS,

                       **Respondent.**
-------------------------------------------------------------x

**ROANNE L. MANN, UNITED STATES MAGISTRATE JUDGE:**

        In this petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254, *pro se*

petitioner Sean Stallings ("petitioner" or "Stallings") seeks relief from the concurrent sentences

imposed on him as a consequence of his conviction in New York State Supreme Court, Queens

County, on two counts of Robbery in the First Degree and two counts of Robbery in the Second

Degree. Both sides have consented to have this matter handled by this magistrate judge for all

purposes. For the reasons that follow, the petition is denied and the case dismissed.

## FACTUAL BACKGROUND

### I. The Evidence at Trial

#### A. The Prosecution's Case

        Stallings' conviction stems from the robberies of two individuals at the "J and D" grocery

store on October 16, 1999. At trial, Junior Rodriguez ("Rodriguez"), a cashier at the store,

testified that he went out that afternoon to buy beer for the bodega, returning between 4:30 p.m.

and 5:00 p.m. (Trial Transcript ["T."] 120.) As he and his co-worker, Patricio Garcia, unloaded

the beer from the van, Garcia directed Rodriguez's attention to a man, later identified as

defendant Sean Stallings, sitting on a bicycle in front of the store, looking inside. (T. 122.)

Rodriguez recognized Stallings as the man against whom he had previously filed complaints and taken out orders of protection in response to two incidents, one in which Stallings threw a bottle through the store window, and the other in which he made threatening gestures toward Rodriguez. (T. 189-90).[1] Rodriguez testified that he had previously seen petitioner "more than 100 times." (T. 123.) While observing petitioner outside the store on October 16, 1999, Rodriguez noticed he was wearing a blue Yankees jacket and blue jeans, and had a scar on his face. (T. 122, 143.)

At approximately 9:15 p.m. that evening, petitioner and two accomplices entered the store holding pistols. (T. 124, 168.) The two accomplices had their faces covered with black "do rags." (T. 132.)[2] Rodriguez, who identified petitioner in court, testified that petitioner's face was not covered when he entered the store and that he recognized petitioner from earlier that day, observing the same scar on his face and the same clothing. (T. 123-24, 132-33, 154-56.) Petitioner approached Rodriguez at the cash register, hit him in the head with a pistol, and demanded that he open the cash register. (T. 127-28.) Petitioner covered his face as he demanded the money, and told Rodriguez "don't look at my face." (T. 127, 154.)[3] Rodriguez

---

[1] Although Rodriguez testified he had taken out "four or five different" orders of protection, he specified only two incidents (T. 189), and produced only two orders to the police. See *infra* at p. 3. At a pretrial hearing on January 10, 2001, the prosecutor indicated to the court that the incidents giving rise to the orders of protection occurred on October 31, 1999 and November 14, 1999. (*Sandoval* Hearing Transcript at 3-5.)

[2] Rodriguez described a "do rag" as "something they wear for the hair but he was using it to cover his face." (T. 132.) When talking to the police after the robbery, he referred to the facial coverings as bandanas. (T. 208.)

[3] It is unclear from the testimony what petitioner used to cover his face. Although Rodriguez had testified that the accomplices wore do rags, or bandanas, the prosecutor asked Rodriguez, on direct examination, if petitioner had "the same panty hose covering" as the two accomplices.

(continued...)

opened the register and gave petitioner the money from inside, which amounted to approximately $400. (T. 128, 155.) The first accomplice stayed by the door, while the second accomplice went to the middle of the store, took a customer's wallet and "shoved him" into a display of potato chips. (T. 129-30.)

After the three men fled the store, Rodriguez called the police. (T. 132, 134.) Officers arrived at the scene 15 minutes later, and Rodriguez described what had transpired. (T. 136, 221.)[4] He told the officers that he recognized one of the robbers, but did not recall his name. (T. 167-68.) One of the officers played the store's surveillance tape on a V.C.R. and television in the back room, but found that "[t]here was nothing to be seen. It was like all snowy." (T. 223.)

Two days later, on October 18, 1999, Rodriguez went to the police precinct with two orders of protection he had previously obtained against Stallings, and identified him as one of the perpetrators. (T. 193.) On October 20, 1999, Detective Frank Cayea arrested petitioner outside his home. (T. 205-06.)

## B. The Defense Evidence

On cross-examination of Rodriguez at trial, the defense attempted to draw out several inconsistencies in his story. Rodriguez reiterated that he had recognized petitioner from the clothing he wore and the scar on his face, which he first noticed at 5:00 p.m. on the day of the

---

[3](...continued)
Rodriguez responded that it was a "[d]ifferent color. It wasn't black. It was like the color of [the prosecutor's] stocking." The prosecutor then asked, "[s]o they were natural color?" Rodriguez responded "yes." (T. 154.)

[4] Defense counsel, on cross-examination, asked Rodriguez about his conversation with an Officer Wimpelberg. (T. 162-68.) That officer did not testify, nor does his first name appear in the record. The prosecution called Police Officer Marc Cottage, who testified that he also responded to the scene and spoke to Rodriguez. (T. 220-23.)

robbery. (T. 157.) Counsel then elicited that Rodriguez had testified before the grand jury that he saw the scar for the first time *during* the robbery. (T. 159.) Rodriguez acknowledged that when he initially spoke to the police and was asked to describe petitioner, he described the clothing he wore but did not mention the scar. (T. 165-67.) He also conceded that he had been unable to recall petitioner's name, although he did tell the police that he recognized him. (T. 165-67, 183.) On redirect, the prosecution was permitted to show that, while Rodriguez had told the grand jury at one point that he did not see the scar until the robbery, he testified at the same proceeding that he actually did first notice the scar earlier that day. (T. 171-73.)

Defense counsel sought to further impeach Rodriguez's credibility regarding his observation of petitioner by eliciting testimony on cross-examination of Detective Cayea that Rodriguez had told him that "three males entered the store wearing bandanas." (T. 206.) However, the detective clarified on redirect that Rodriguez had told him that "one of the males when he entered the store he did not have his bandana on, and put it on as he was coming into the store." (T. 208.)

Ky'al Gordon and Tahj White, both long-time friends of petitioner (T. 242, 279), testified on his behalf. Their testimony conflicted on several details. Gordon testified that she went to the bodega at around 8:00 p.m. the evening of the robbery to buy some refreshments. She met up with White at around 9:00 p.m. in front of the barber shop next door, where White was about to get his hair cut. (T. 247.) Their attention was drawn to the bodega when someone said it was being robbed. (T. 249.) Gordon saw three men leave the store: one was 5'8 to 5'10 and 200 pounds, with light brown skin; another was approximately the same height and had the same complexion, but was thin; the third was approximately five feet tall with a darker complexion. (T.

233, 250-51.)  All three wore gray hooded sweatshirts with the hoods tied tightly around their heads and had bandanas covering their mouths, such that only their noses and eyes were visible. (T. 233, 256.)  The heavy-set man exited first, followed by the skinny man, and then the short man, who was holding a gun. (T. 250, 256.)  When asked about the lighting conditions on the street, Gordon answered that it was dark. (T. 256.)  She further testified that, as the three men left, "[t]hey didn't run away, they walked away." (T. 258.)  After the robbery, Gordon did not go to the police, but she and White (and no one else) met with an investigator hired by defense counsel. (T. 259-63.)

White testified on direct that when he ran into Gordon outside the barbershop, he had "[j]ust finished getting [his] hair cut" and was waiting outside for another friend. (T. 275.)  On cross-examination, however, when the court inquired "did you ever get your hair cut?," he answered "No, I left after [the robbery]." (T. 294.)  White testified that the corner where he and Gordon were standing was "pretty well lit," by a street lamp and the lights from the storefronts. (T. 278.)  As they were talking, he saw a short, dark-skinned man in a hooded sweatshirt, jeans and a jacket enter the bodega while pulling a handkerchief over his face. (T. 289.)  At some point, White's friend, Donald Sterling, who had gone into the store to get something, returned and said that the store was being robbed. (T. 276.)  Approximately one minute later, White saw three men leave the bodega; two were 5'7 to 5'10 with dark skin, while the third was taller, with a lighter complexion. (T. 276.)  White did not see anyone holding a gun. (T. 290.)  The three men "were moving quickly" and "bolted around the corner." (T. 291.)  The following week, White, Gordon, and Gordon's friend Bobby all met with a defense investigator, and all spoke about their observations on the evening of the robbery.  (T. 297-98.)

### C.  The Verdict and Sentence

The jury found petitioner guilty of two counts of Robbery in the First Degree and two counts of Robbery in the Second Degree. (T. 392-93.)  He was sentenced to determinate prison terms of ten years for each first degree robbery conviction, and seven years for each second degree robbery conviction, all of which were to run concurrently. (Sentencing Transcript ["S."] 8.)  Petitioner is currently incarcerated pursuant to that judgment of conviction.

## II.  The *Wade* Hearing

Prior to trial, the Honorable Stanley B. Katz of the Supreme Court, Queens County, held a *Wade* hearing[5] to determine whether to suppress Rodriguez's identification of petitioner on the basis that it was the product of an unduly suggestive single-photo identification procedure. Detective Cayea, the sole witness at the hearing, testified that the police were able to retrieve a photo of petitioner from their computer database after Rodriguez brought to their attention the two orders of protection that he had previously taken out against petitioner. (*Wade* Hearing Transcript ["H."] 14-15.)  Cayea then interviewed Rodriguez, who related to him "that three males entered the store wearing bandanas," and that one of them walked to the register, pointed a gun, and demanded money. (H. 8.)  Cayea showed Rodriguez the photograph, and Rodriguez confirmed that it depicted one of the men who had robbed his store. (H. 8.)  Rodriguez indicated that he had previously filed a complaint against petitioner for damaging his store, that he had seen him on numerous prior occasions near the store, often wearing a Yankees jacket, and that he saw him during the afternoon of the robbery. (H. 9-10.)  Rodriguez also stated that he recognized

---

[5]The purpose of a *Wade* hearing is to determine whether identification testimony has been tainted by official suggestion during police-arranged pretrial identification procedures. United States v. Wade, 388 U.S. 218 (1967); see also People v. Dixon,  85 N.Y.2d 218 (1995).

petitioner during the robbery from a scar on his face. (H. 15.)  Cayea asked Rodriguez how many times he had seen petitioner in the past, inquiring if it was "more than ten" times.  Rodriguez answered "yes." (H. 10.)

On September 25, 2000, the court issued a written opinion denying suppression of the in-court identification.[6]  (9/25/00 Decision and Order on Motion to Suppress Evidence of Identification, Respondent's Exhibit J [RX J], appended to Declaration in Opposition to Petition for a Writ of Habeas Corpus.)  The court held that, because a prior familiarity existed between Rodriguez and petitioner, "the identification procedure [was] . . . merely confirmatory, and need not be suppressed as suggestive." (RX J at 2.)

### III.  Post-Conviction History

On June 26, 2002, petitioner appealed to the New York Supreme Court, Appellate Division, Second Department, on the same grounds that he raises in his habeas petition, namely that: (1) the prosecution failed to prove Stallings' guilt beyond a reasonable doubt, and the verdict was against the weight of the evidence; (2) Stallings' sentence was excessive; (3) the court's findings of fact with regard to the identification testimony were not supported by the record of the *Wade* hearing; (4) the court abused its discretion when it refused, upon defense counsel's request, to instruct the jury to scrutinize the identification testimony; and (5) Stallings was denied effective assistance of trial counsel.

In a decision dated July 21, 2003, the Appellate Division unanimously affirmed the

---

[6]  Although the court's opinion does not specifically reference the admissibility of the out-of-court identification, at trial the court sustained defense counsel's objections to the prosecutor's questions of Detective Michael Failla regarding how police officers obtained and used a photograph of petitioner. (T. 201-02.)

conviction, specifically finding that (1) the record of the *Wade* hearing supported the factual determination that Rodriguez's identification of Stallings from a single photograph was merely confirmatory; (2) Stallings' challenge to the sufficiency of the evidence was unpreserved for appellate review, and, in any event, meritless; (3) the resolution of issues of credibility and the weight to be accorded the evidence presented were questions for the trier of fact; (4) the sentence imposed was not excessive; and (5) Stallings' "remaining contentions, including those raised in his supplemental pro se brief, are without merit." People v. Stallings, 762 N.Y.S.2d 517, 518 (2d Dep't 2003).

By letter dated August 11, 2003, petitioner sought leave to appeal to the New York Court of Appeals. On December 3, 2003, the court denied petitioner's application. People v. Stallings, 1 N.Y.3d 581 (2003).

Petitioner timely filed his federal habeas petition, in the Southern District of New York, on October 1, 2004. On that same day, by order of Chief Judge Michael Mukasey, the case was transferred to this district. District Judge Nina Gershon referred the petition to this magistrate judge for a Report and Recommendation on January 18, 2006. Since then, both sides have consented to have the case handled for all purposes by a magistrate judge, pursuant to 28 U.S.C. § 636(c)(1). (2/6/06 Letter to the Court from Petitioner Sean Stallings, and attachment thereto; 3/23/06 Letter to the Court from Respondent State of New York.)

## **DISCUSSION**

## I.  Standard of Review

The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") established a deferential standard that federal habeas courts must apply when reviewing state court convictions. Under AEDPA, a federal court may grant habeas relief with respect to a federal claim adjudicated on the merits in state court only if that adjudication (1) was "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," or (2) was "based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d).

The threshold inquiry is whether the petitioner "seeks to apply a rule of law that was clearly established at the time his state-court conviction became final." Kennaugh v. Miller, 289 F.3d 36, 42 (2d Cir. 2002) (quoting Williams v. Taylor, 529 U.S. 362, 390 (2000)).  A law is clearly established if it has been enunciated in the holding – as opposed to dicta – of a Supreme Court decision, whether as a generalized standard "or a bright-line rule designed to effectuate such a standard in a particular context." Kennaugh, 289 F.3d at 42; see also Williams, 529 U.S. at 412.

A state court decision is "contrary to" Supreme Court precedent if the court "applies a rule that contradicts the governing law," or "confronts a set of facts that are materially indistinguishable from a decision of [the Supreme] Court and nevertheless" arrives at a different result. Williams v. Taylor,  529 U.S. 362, 406 (2000).

A decision involves an "unreasonable application" of Supreme Court precedent if the state court "identifies the correct governing legal rule from the [Supreme] Court's cases but

unreasonably applies it to the facts of the particular state prisoner's case," or if it "either unreasonably extends a legal principle from [Supreme Court] precedent to a new context where it should not apply or unreasonably refuses to extend that principle to a new context where it should apply." Id. at 407. The relevant inquiry is "whether the state court's application of clearly established federal law was objectively reasonable," and not merely whether, in the independent judgment of the federal habeas court, the decision was erroneous or incorrect. Id. at 409-10.

Regarding the second prong of AEDPA, a state court's factual determinations are presumed to be correct. 28 U.S.C. § 2254(e)(1). Such determinations are unreasonable only where the petitioner rebuts the presumption of correctness "by clear and convincing evidence." Id. By its terms, AEDPA's deferential standard of review applies only to federal claims adjudicated on the merits. An adjudication is on the merits if it was "a decision finally resolving the parties' claims, with res judicata effect, that is based on the substance of the claim advanced, rather than on a procedural, or other, ground." Sellan v. Kuhlman, 261 F.3d 303, 311 (2d Cir. 2001). AEDPA's deferential standard of review applies even if the state court did not "explicitly refer to either the federal claim or to relevant federal case law." Id. at 312. As long as the state court "dispose[d] of the petitioner's federal claim on substantive grounds, and reduce[d] that disposition to judgment[,] [n]o further articulation of its rationale or elucidation of its reasoning process is required." Aparicio v. Artuz, 269 F.3d 78, 94 (2d Cir. 2001); accord Early v. Packer, 537 U.S. 3, 8 (2002) (state court not required to cite Supreme Court cases, or even be aware of them, to be entitled to AEDPA deference, "so long as neither the reasoning nor the result of the state-court decision contradicts them."); James v. Artus, No. 03 Civ. 7612(AJP), 2005 WL 859245, at *7 (S.D.N.Y. Apr. 15, 2005) ("Even where the state court decision does not

specifically refer to either the federal claim or to relevant case law, the deferential AEDPA review standard applies.").

## II.  Petitioner's Claims

Petitioner seeks habeas relief on six separate grounds: (1) the verdict was against the weight of the evidence; (2) the evidence was legally insufficient to establish guilt beyond a reasonable doubt; (2) the sentence imposed was excessive; (4) the trial court erred in denying his motion to suppress identification testimony; (5) the trial court abused its discretion in denying his request to instruct the jury to scrutinize the identification testimony; and (6) he was denied effective assistance of trial counsel.

### A.  Weight of the Evidence

Petitioner's claim that the verdict was against the weight of the evidence is not cognizable on federal habeas review as it does not raise a constitutional issue. See Lemons v. Parrott, 01 Civ. 9366, 2002 WL 850028, at *3 (S.D.N.Y. May 2, 2002) ("[W]e have no authority to review a weight of the evidence argument because it is a state law claim."); Correa v. Duncan, 172 F.Supp.2d 378, 381 (E.D.N.Y. 2001) (a weight of the evidence claim is "a pure state law claim grounded in New York Criminal Procedure Law § 470.15(5)" and is therefore not reviewable on habeas); Rodriguez v. O'Keefe, No. 96 CIV. 2094 (LLS), 1996 WL 428164, at *4 (S.D.N.Y. July 31, 1996) ("A claim that the verdict was against the weight of the evidence is not cognizable on habeas review.").

### B.  Sufficiency of the Evidence

Petitioner also argues that the prosecution failed to prove his guilt beyond a reasonable doubt.  Such a claim goes to the legal sufficiency of the evidence to support a guilty verdict and,

as it implicates federal due process principles, is ordinarily cognizable on habeas review. <u>See</u> <u>Jackson v. Virginia</u>, 443 U.S. 307, 315 (1979) ("[T]he Due Process Clause of the Fourteenth Amendment protects a defendant in a criminal case against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged.") (internal quotation marks and citation omitted); <u>Correa v. Duncan</u>, 172 F.Supp.2d 378, 381 (E.D.N.Y. 2001).  The Appellate Division rejected this claim as both procedurally barred and without merit.  <u>People v. Stallings</u>, 762 N.Y.S.2d 517 (2d Dep't 2003).

### 1. Procedural Default

Habeas review of petitioner's sufficiency claim is nevertheless barred as it is procedurally defaulted.  A federal court may not review a question of federal law decided by a state court "if the decision of that court rests on a state law ground that is independent of the federal question and adequate to support the judgment." <u>Coleman v. Thompson</u>, 501 U.S. 722, 729 (1991); <u>see</u> <u>also</u> <u>Fama v. Comm'r of Corr. Servs.</u>, 235 F.3d 804, 809 (2d Cir. 2000).  A petitioner's failure to meet a state procedural requirement is considered an independent and adequate state law ground for dismissal, and will preclude federal habeas review of the merits of a claim, if the procedural rule is "firmly established and regularly followed," <u>Ford v. Georgia</u>, 498 U.S. 411, 424 (1991), and if the state court's reliance on the state procedural law is "clear from the face of the opinion." <u>Fama</u>, 235 F.3d at 809; <u>see</u> <u>also</u> <u>Jones v. Vacco</u>, 126 F.3d 408, 415 (2d Cir. 1997) ("[I]n order to preclude federal review, the last state court to render judgment must clearly and expressly state that its judgment rested on a state procedural bar.") (internal quotation marks, brackets and citation omitted).  Where reliance on the procedural rule is evident, habeas review is barred "even where the state court has also ruled in the alternative on the merits of the

federal claim." <u>Velasquez v. Leonardo</u>, 898 F.2d 7, 9 (2d Cir. 1990). Thus, if a state court holds

that a claim is "not preserved for appellate review," and proceeds to rule "in any event" on the

merits, habeas review of the merits is precluded. <u>Fama</u>, 235 F.3d at 811 n.4.[7]

A federal court may excuse a procedural default and consider the merits of an otherwise

unreviewable claim only if the petitioner either demonstrates "cause for the default and actual

prejudice as a result of the alleged violation of federal law," or shows that "failure to consider the

claim[] will result in a fundamental miscarriage of justice." <u>Coleman</u>, 501 U.S. at 750. To

establish cause, petitioner must show that "some objective factor external to the defense impeded

counsel's efforts to comply with the State's procedural rule." <u>Murray v. Carrier</u>, 477 U.S. 478,

488 (1986). To establish prejudice, "petitioner must show not merely a possibility of prejudice,

but that the alleged error worked to his actual and substantial disadvantage." <u>Singleton v. Duncan</u>,

No. 03 CV 561(ARR), 2006 WL 73734, at *6 (E.D.N.Y. Jan. 10, 2006) (internal quotation marks

and citation omitted). A miscarriage of justice occurs only "in an extraordinary case, where a

constitutional violation has probably resulted in the conviction of one who is actually innocent."

<u>Murray</u>, 477 U.S. at 496. Petitioner must show that "it is more likely than not that no reasonable

juror would have found petitioner guilty beyond a reasonable doubt" in light of newly presented

evidence. <u>Schlup v. Delo</u>, 513 U.S. 298, 327 (1995).

In this case, the Appellate Division, citing section 470.05[2] of New York's Criminal

Procedure Law, expressly held that Stallings' challenge to the legal sufficiency of the evidence

---

[7] In contrast, where a state court "uses language such as 'the defendant's remaining contentions are either unpreserved for appellate review or without merit,' the validity of the claim is preserved and is subject to federal review" because the basis for the rejection is unclear. <u>Fama</u>, 253 F.3d at 810-11.

was unpreserved for appellate review. People v. Stallings, 762 N.Y.S.2d 517, 518 (2d Dep't 2003). The aforesaid statute, known as New York's "contemporaneous objection rule," mandates that an objection be lodged at the time a ruling is made or "at any subsequent time when the court had an opportunity of effectively changing the same," and that the objection be sufficiently specific to "make [the defense] position with respect to the ruling or instruction known to the court." N.Y. Crim. Proc. Law § 470.05[2]. In applying section 470.05[2] to legal sufficiency claims, "New York courts have held that a general motion to dismiss is inadequate; instead, the defendant must specify the deficiency in proof." Farrington v. McLaughlin, No. 01-CV-7005 (JBW), 2003 WL 21812903, at *5 (E.D.N.Y. July 23, 2003) (citing People v. Stahl, 53 N.Y.2d 53, 1048, 1049-50 (1981)); see also People v. Gray, 86 N.Y.2d 10, 19 (1995) (holding that even where a motion to dismiss for insufficient evidence is made, the preservation rule requires that the objection be "specifically directed" at the alleged deficiency).

While Stallings timely raised an objection to the sufficiency of the evidence at his trial, the objection was made only in the most general of terms.[8] Because the objection lacked the requisite specificity, the state court held the claim to be procedurally barred. See, e.g., Farrington, 2003 WL 21812903, at *5 (where defense counsel requested that "all charges in the indictment [] be dismissed because the People have not made out a prima facie case," and made no further argument, federal habeas court held that "the Appellate Division properly found petitioner's legal sufficiency claim to be procedurally barred" for failure to specify the ground of the motion to

---

[8] The defense objection comprised the following statement: "I don't believe that the People have made out a prima facie case or a case that should go to the jury as beyond a reasonable doubt. I'd ask that the indictment against Mr. Stallings be dismissed as to proof not being sufficient to sustain the charges of the indictment." (T. 303.)

dismiss). The fact that the state court reached the merits of the claim in the alternative does not affect the applicability of the procedural default doctrine.[9] See Fama v. Comm'r of Corr. Servs., 235 F.3d 804, 811 n.4 (2d Cir. 2000).

New York's contemporaneous objection rule is a firmly established and regularly followed procedural rule, and thus constitutes an adequate bar to federal habeas review. See Garcia v. Lewis, 188 F.3d 71, 79 (2d Cir. 1999) (courts in the Second Circuit "have deferred to New York's consistent application of its contemporaneous objection rules."). Petitioner's failure to comply with the contemporaneous objection rule may not be excused, as he has neither attempted to demonstrate cause for his default nor alleged that he is actually innocent.[10] Petitioner's claim of legal sufficiency is therefore procedurally barred.

### 2. The Merits

The Second Department also concluded that even if not procedurally defaulted, petitioner's claim regarding the sufficiency of the evidence was nevertheless meritless.[11] That adjudication on the merits is entitled to deference under AEDPA. See Zarvela v. Artuz, 364 F.3d 415, 417-18 (2d Cir. 2004).

A petitioner challenging the sufficiency of the evidence faces a "very heavy burden."

---

[9] After finding that the claim was procedurally barred, the court stated that, "[i]n any event, viewing the evidence in the light most favorable to the prosecution, . . . it was legally sufficient to establish defendant's guilt beyond a reasonable doubt." People v. Stallings, 762 N.Y.S.2d 517 (2d Dep't 2003).

[10] Although Stallings asserts a habeas claim for ineffective assistance of counsel, he does not raise as a ground for that claim counsel's failure to bring a proper challenge to the legal sufficiency of the evidence at trial. Therefore, he cannot look to counsel's conduct to satisfy the "cause" exception to procedural default.

[11] See *supra* note 9.

Knapp v. Leonardo, 46 F.3d 170, 178 (2d Cir. 1995) (internal quotation marks and citation omitted).  A state criminal conviction will be upheld if the evidence, viewed in the light most favorable to the prosecution, and crediting every inference that could have been drawn in its favor, provided a basis on which a "jury might fairly have concluded guilt beyond a reasonable doubt." United States v. Rosa, 11 F.3d 315, 337 (2d Cir. 1993); see also Jackson v. Virginia, 443 U.S. 307, 319 (1979) ("[T]he relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.") (emphasis in original).  "This standard recognizes that 'it is the responsibility of the trier of fact to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts.'  Where the record supports conflicting inferences, the court 'must presume . . . that the trier of fact resolved any such conflicts in favor of the prosecution, and must defer to that resolution.'" Alvarez v. Conway, No. 05 Civ. 3235(NRB), 2005 WL 3434634, at *5 (S.D.N.Y. Dec. 13, 2005) (quoting Jackson, 443 U.S. at 319, 326).

In this case, the prosecution's evidence consisted primarily of Rodriguez's testimony that he saw petitioner in the afternoon outside his store, saw his face during the robbery, furnished police two days later with orders of protection he had previously obtained against petitioner, and identified petitioner in court as one of the robbers.  This testimony alone is sufficient to sustain a conviction.  See United States v. Frampton, 382 F.3d 213, 222 (2d Cir. 2004) ("'[T]he testimony of a single, uncorroborated eyewitness is generally sufficient to support a conviction.'") (quoting United States v. Danzey, 594 F.2d 905, 916 (2d Cir. 1979)).  The jury also heard from Officer Mark Cottage, who responded to the scene of the robbery, Detective Michael Failla, to whom

Rodriguez gave the orders of protection at the police precinct, and Detective Cayea, who arrested petitioner.

Stallings points to several inconsistencies in the witnesses' testimony, including whether petitioner covered his face upon entering the store or once inside, and whether Rodriguez saw petitioner's scar for the first time earlier in the day or during the robbery. (Petitioner's Pro Se Supplemental Brief to Appellate Division ["Pet. Supp. Br."] at 11-12.) These inconsistencies, petitioner argues, render Rodriguez's testimony unreliable.

A rational jury could nevertheless have found Stallings guilty beyond a reasonable doubt on the evidence presented. A "[p]etitioner cannot prevail on a claim that the evidence was legally insufficient to support the verdict merely by showing that the evidence had inconsistencies." Moore v. Greiner, No. 02 Civ. 6122(SAS)(DF), 2005 WL 2665667, at *19 (S.D.N.Y. Oct. 19, 2005). The resolution of these inconsistencies was within the province of the jury. See, e.g., Pratt v. Upstate Corr. Facility, No. 02 CV 6278, 2006 WL 302759, at *9 (W.D.N.Y. Feb. 9, 2006) (inconsistencies in witness' statements "[did] not render [his] testimony incredible as a matter of law."); Brown v. Schultz, No. 03 Civ. 3320 PAC/HBP, 2006 WL 156983, at *8 (S.D.N.Y. Jan. 18, 2006) ("[T]he resolution of inconsistencies in a witness's testimony is a classic jury function; the presence of such inconsistencies does not render the evidence insufficient to support a conviction.") (citing Quartararo v. Hanslmaier, 186 F.3d 91, 95-96 (2d Cir. 1999)); Roman v. Filion, No. 04 Civ. 8022 KMWAJP, 2005 WL 1383167, at *32 (S.D.N.Y. Jun. 10, 2005) (evidence was sufficient although there was only one eyewitness whose testimony was the primary evidence against petitioner, and there "may have been some inconsistencies between [the witness'] testimony and her prior statements."); Brooks v. Donnelly, No. 02-CV-5883 (JBW),

2003 WL 23199559, at *10 (E.D.N.Y. Dec. 8, 2003) ("Minor inconsistencies in the testimony of the prosecution's witnesses or the failure of [a witness] to have reported a scar on petitioner's face were factors within the province of the factfinder to weigh in determining witness credibility."); Carromero v. Strack, No. 98 Civ. 3519(LAP), 1998 WL 849321, at *5 (S.D.N.Y. Nov.19, 1998) (evidence was legally sufficient where jury credited prosecution witnesses' testimony "despite some inconsistencies between their trial testimony and prior statements to the police and to the grand jury.").

While petitioner contends that the jury should have credited the "completely believable" testimony of Tahj White and Ky'al Gordon, who claimed to have seen the robbers and "were positive" that petitioner was not among them (Pet. Supp. Br. at 12-13), a reasonable juror was certainly entitled to credit the prosecution's version of events over that of the defense. This Court may not revisit these credibility determinations. Alvarez v. Conway, No. 05 Civ. 3235(NRB), 2005 WL 3434634, at *5 (S.D.N.Y. Dec. 13, 2005) (citing Marshall v. Longberger, 459 U.S. 422, 432-35 (1983)).

## C. Failure to Suppress In-Court Identification Testimony

Petitioner challenges the admission of Rodriguez's in-court identification on the ground that it was the tainted product of an unduly suggestive police procedure involving the display of a single photograph. Because petitioner's claim implicates clearly established federal law, and the state court adjudicated the claim on the merits, AEDPA's deferential standard of review applies. See Kennaugh v. Miller, 289 F.3d 36, 42 (2d Cir. 2002) (reviewing claim of tainted in-court identification under AEDPA because "Supreme Court precedent has set forth a due process standard . . . prohibiting the admission of unreliable eyewitness testimony."). In order to obtain

federal habeas relief, petitioner must demonstrate that the Appellate Division's decision rejecting his claim "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1).

The "reliability of eyewitness identification testimony is usually an issue for jury determination," and may be excluded only to preserve a defendant's due process rights when "the degree of unreliability leads to 'a very substantial likelihood of irreparable misidentification.'" Kennaugh, 289 F.3d at 43 (quoting Manson v. Brathwaite, 432 U.S. 98, 114, 116 (1977)). "Where the pretrial identification procedures used with a given witness have been impermissibly suggestive, a later in-court identification by that witness will violate due process unless the in-court identification is shown to have reliability independent of those procedures." Jarrett v. Headley, 802 F.2d 34, 42 (2d Cir. 1986).

The Supreme Court has established a two-pronged inquiry for determining whether pretrial identification procedures tainted an in-court identification. First, the court must consider "whether the pretrial identification procedures unduly and unnecessarily suggested that the defendant was the perpetrator." Raheem v. Kelly, 257 F.3d 122, 133 (2d Cir. 2001); see also id. ("Suggestive identification procedures 'increase the likelihood of misidentification,' and '[i]t is the likelihood of misidentification which violates a defendant's right to due process.'") (quoting Neil v. Biggers, 409 U.S. 188, 198 (1972)). If the court answers this question in the affirmative, it must then "weigh the corrupting effect of the suggestiveness against other factors indicating that the identification may be independently reliable . . . ." Raheem, 257 F.3d at 135 (internal quotation marks, brackets and citation omitted); see also Manson v. Brathwaite, 432 U.S. 98, 114 (1977) (holding that "reliability is the linchpin in determining the admissibility of identification

-19-

testimony.").  The question of independent reliability must be assessed in light of the totality of the circumstances. See Biggers, 490 U.S. at 199-200; Manson, 432 U.S. at 114.

The Second Circuit has "consistently condemned the exhibition of a single photograph as a suggestive practice." Mysholowsky v. People, 535 F.2d 194, 197 (2d Cir. 1976); see also United States v. Lumpkin, 192 F.3d 280, 288 (2d Cir. 1999).  This does not, however, end the inquiry.

In this case, the testimony at the *Wade* hearing established that Rodriguez had seen Stallings "more than ten" times around the neighborhood prior to the robbery, and had taken out two orders of protection against him. (H. 9-10, 15.)  The trial court found that, although Rodriguez was shown a single photograph, his longstanding familiarity with petitioner rendered his identification independently reliable.  This decision was based upon the New York rule that in-court identifications may be admissible despite prior suggestive procedures if the witness knew the defendant. See People v. Rodriguez, 79 N.Y.2d 445, 449-50 (1992).  The state rule "tracks the federal standard that identification procedures violate due process only if they yield 'unreliable' identifications." Espinal v. Duncan, No. 00 Civ. 4844 (RWS), 2000 WL 1774960, at *3 (S.D.N.Y. Dec. 4, 2000); see, e.g., United States v. Perez, No. 01 CR. 848(SWK), 2003 WL 721568, at *4 (S.D.N.Y. Feb. 28, 2003) (witness' "level of contact" with defendant, including numerous meetings and drug transactions over several years, was "sufficient to provide an independently reliable basis for his identification."); Martinez v. Artuz, 99 Civ. 5744 (WHP) (GWG), 2001 WL 540737, at *9 (S.D.N.Y. May 22, 2001) (where witness knew petitioner for at least three years prior to the crime, saw him once a day and regularly spoke to him, trial court "properly determined that [the witness] was sufficiently familiar with [defendant] to obviate any possibility that the [challenged] lineup could have tainted her identification."); Espinal, 2000 WL 1774960,

at *2  (in-court identification was valid despite use of single photograph where trial court found an independent source of reliability, "namely that [the witness] already knew [petitioner] by first name as well as street name, . . .  knew where [petitioner] lived and the car he drove, and had seen him at least 20 times in the prior year.") (internal quotation marks, brackets and citation omitted).

Faced with these clear legal principles, petitioner instead challenges the trial court's factual findings regarding Rodriguez's prior acquaintance with him. (Pet. Supp. Br. at 3-4.) However,  these findings are entitled to a "presumption of correctness" that can be rebutted only "by clear and convincing evidence." Cotto v. Herbert, 331 F.3d 217, 233 (2d Cir. 2003); see 28 U.S.C. § 2254(e)(1).  Petitioner provides no support for his argument, and thus does not meet this high burden.  As no due process violation resulted from the admission of Rodriguez's in-court identification, petitioner's claim is unavailing.

### D.  The Identification Charge

Petitioner contends that the trial court improperly refused to give an expanded jury charge with respect to the identification testimony.  Prior to summations, defense counsel requested that the judge give "an expansive charge on identification testimony that would emphasize its unreliability and the close scrutiny that should" be given to its review. (T. 308.) After the court charged the jury, counsel took exception, arguing that his requested instruction was not given. (T. 365.)  The judge held that "the charge as given which is the new [New York Criminal Jury Instruction] charge is totally adequate" in satisfying the defense request. (T. 365.)[12]

---

[12]   New York's Criminal Jury Instructions are promulgated by the New York State Office of Court Administration, Committee on Criminal Jury Instructions.  The current (i.e., second) edition is published online at http://www.nycourts.gov/cji/1-General/cjigc.html, which is located on the New York State Unified Court System web site.

"Jury charges are normally a matter of state law," and do not warrant federal habeas relief unless the alleged errors "deprive[d] the defendant of a federal constitutional right." <u>Perez v. Greiner</u>, No. 00 Civ. 5504 (RCC)(KNF), 2005 WL 613183, at *6 (S.D.N.Y. Mar. 14, 2005) (citing <u>Gilmore v. Taylor</u>, 508 U.S. 333, 342 (1993)). To prevail on a habeas challenge to a state court's jury instructions, the petitioner may not rest on a mere violation of state law; rather, he must show that the error "so infected the entire trial that the resulting conviction violates due process." <u>Estelle v. McGuire</u>, 502 U.S. 62, 72 (1991) (internal quotations and citation omitted). "A mere error of state law does not deny a defendant his right to due process." <u>Blazic v. Henderson</u>, 900 F.2d 534, 541 (2d Cir. 1990).

The charge in this case violated neither state law nor federal due process. Under New York law, "[t]he decision whether or not to give an expanded instruction is left in the sound discretion of the trial judge."<u>Aparicio v. Artuz</u>, 269 F.3d 78, 99 (2d Cir. 2001) (internal quotation marks and citation omitted). "[A]lthough expanded identification instructions are preferable, especially when there is a close question of identity, the failure to give such an instruction does not constitute reversible error." <u>Id.</u> (quoting <u>People v. Whalen</u>, 59 N.Y.2d 273, 279 (1983)). "A trial judge who gives a 'general instruction on weighing witnesses' credibility and who states that identification must be proven beyond a reasonable doubt has made an accurate statement of the law.'" <u>Id.</u> (quoting <u>Whalen</u>,, 59 N.Y.2d at 279); <u>see</u>, <u>e.g.</u>, <u>People v. Knight</u>, 87 N.Y.2d 873, 874 (1995) (charge that "instructed the jury fully on its duty to determine the credibility of the witnesses" was "a correct statement of the law which sufficiently apprised the jury that the reasonable doubt standard applied to identification.").

The trial court's jury instructions in this case far exceeded these standards and, as the

judge noted, closely followed New York's Criminal Jury Instruction on identification testimony.[13] See CJI2d [NY], Identification – One Witness. While the charge did not include the word "scrutinize," as requested by the defense, a court's failure to give a particular requested charge "does not by itself violate a petitioner's right to due process." Otero v. Eisenschmidt, No. 01 Civ. 2562HB AJP, 2004 WL 2504382, at *25 (S.D.N.Y. Nov. 8, 2004) (citing Blazic, 900 F.2d at 541).

The trial court's jury charge with respect to identification testimony was more than adequate, and the Appellate Division's rejection of petitioner's claim was not contrary to clearly established federal law. See Aparicio, 269 F.3d at 100 (charge was sufficient where it instructed jury that, before convicting, it should assess the credibility of the witnesses and "conclude beyond a reasonable doubt that the defendant was the perpetrator of every element of an offense.").

**E. Ineffective Assistance of Counsel**

The Appellate Division rejected Stallings' ineffective assistance of counsel claim with a summary statement that "[t]he defendant's remaining contentions, including those raised in his supplemental pro se brief, are without merit." People v. Stallings, 762 N.Y.S.2d 517, 518 (2d Dep't 2003). This constitutes an adjudication of the claim on the merits, which is reviewed under

---

[13]  The charge instructed the jury to evaluate the truthfulness and accuracy of an identification, considering such factors as the witness' believability, opportunity to observe and recall the perpetrator's appearance, and mental, physical and emotional state, as well as the circumstances under which the witness identified the petitioner – i.e., the suggestiveness of the identification procedure. (T. 352-54.)  The judge also stated that "[a] guilty verdict is permitted . . . only if the evidence is of sufficient quality to convince you beyond a reasonable doubt that all the elements of the charged crimes have been proven and that the identification of the defendant is both [truthful] and accurate." (T. 352.)

AEDPA's deferential standard. See Aparicio, 269 F.3d at 94 ("When . . . a state court fails to explicate a coherent rationale for its rejection of a petitioner's claim, but that rejection nevertheless is clearly on the merits, the federal court must 'focus its review on whether the state court's ultimate decision was an 'unreasonable application' of clearly established Supreme Court precedent.'") (quoting Sellan v. Kuhlman, 261 F.3d 303, 311-12 (2d Cir. 2001)).

### 1. The *Strickland* standard

To prevail on a Sixth Amendment claim of ineffective assistance of counsel, a petitioner must prove *both* that his counsel's conduct was deficient and that he was prejudiced by this deficiency. See Strickland v. Washington, 466 U.S. 668, 687-88 (1984).

As to the first prong of the *Strickland* test, petitioner must establish that his counsel's representation fell below an objective standard of reasonableness, as measured by prevailing professional norms. Id. at 687-88. Petitioner must overcome a "strong presumption that counsel's conduct falls within the wide range of reasonable professional judgment," and that it constitutes "sound trial strategy." Id. at 689. It is well settled that "strategic choices made by counsel after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable . . . ." Id. at 690. A "strategic decision" is a "conscious, reasonably informed decision made by an attorney with an eye to benefitting his client." Cox v. Donnelly, 387 F.3d 193, 197 (2d Cir. 2004) (internal quotation marks and citation omitted).

In evaluating attorney performance, a court must make "every effort . . . to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." Strickland, 466 U.S. at 689. Any errors in counsel's representation must be considered in light of the "totality of the evidence

before the judge or jury," rather than in isolation. Lindstadt v. Keane, 239 F.3d 191, 199 (2d Cir. 2001) (quoting Strickland, 466 U.S. at 695); see, e.g., Arkin v. Bennett, 282 F.Supp.2d 24, 35 (S.D.N.Y. 2003) (where counsel's representation was generally very competent, his failure to impeach a strong identifying witness by questioning him about his inability to pick petitioner out of an initial photo array "[did] not make counsel's performance fall outside the wide range of reasonable assistance.") (internal quotation marks and citation omitted). Counsel's performance will not be considered constitutionally deficient unless the errors were "so serious that counsel was not functioning as the 'counsel' guaranteed . . . by the Sixth Amendment." Strickland, 466 U.S. at 687.

As to the prejudice prong of the *Strickland* test, petitioner must show that there is a reasonable probability that, but for counsel's errors, the outcome of the proceeding would have been different. Id. at 694. A reasonable probability is one that is "sufficient to undermine confidence in the outcome" of the proceeding. Id. at 694. It is insufficient to show only that the errors had "some conceivable effect" on the outcome. Id. at 693; see also Lindstadt, 239 F.3d at 204 ("The level of prejudice the [petitioner] need demonstrate lies between prejudice that 'had some conceivable effect' and prejudice that 'more likely than not altered the outcome in the case.'") (quoting Strickland, 446 U.S. at 693).

A court faced with a challenge under *Strickland* need not undertake its analysis in any particular order. "If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice," the court need not address the deficiency prong of the test. Strickland, 466 U.S. at 697.

The *Strickland* standard is considered "clearly established Federal law." Aparicio v.

Artuz, 269 F.3d 78, 95 n.8 (2d Cir. 2001). To obtain habeas relief, petitioner must prove that the state court applied *Strickland* unreasonably to the facts of his claim. Aparicio, 269 F.3d at 95. The "standard is rigorous, and the great majority of habeas petitions that allege constitutionally ineffective counsel founder on that standard." Lindstadt, 239 F.3d at 199.

### 2. Petitioner's claims

Petitioner claims that his trial counsel was ineffective for failing to: (1) move for a so-called *Rodriguez* hearing,[14] rather than a *Wade* hearing, to challenge the admissibility of Rodriguez's in-court identification; (2) adequately cross-examine Rodriguez at trial, and Detective Cayea at the suppression hearing; (3) object to impermissible bolstering of identification testimony; (4) interview and offer the testimony of Patricio Garcia, who was working at the bodega during the robbery; and (5) seek a definitive ruling or curative instructions with regard to defense counsel's mistrial motions. Viewed individually or together, these claims do not overcome the strong presumption that trial counsel's representation was adequate.

### a. Failure to object to allegedly impermissible bolstering

Petitioner argues that counsel failed to object to Detective Failla's alleged bolstering of Rodriguez's in-court identification of Stallings. (Pet. Supp. Br. at 21-22.) Under New York law, "improper bolstering occurs when a third party testifies to another witness's prior identification . . . ." People v. Smith, 806 N.Y.S.2d 825, 826 (4th Dep't 2005) (internal quotation marks and citations omitted). As Failla never testified about Rodriuez's prior, out-of-court identification of Stallings, his testimony does not constitute "bolstering." Failla testified only that he retrieved a photo from the police computer database, saying nothing about the fact that Rodriguez later

---

[14] See *infra* note 17.

identified Stallings from this photograph. (T. 201.)  Moreover, as soon as Failla testified about

retrieving the photograph, defense counsel objected, requested a sidebar,[15] and succeeded in

having that testimony stricken from the record. (T. 200-02.)  At the conclusion of the day's

testimony, counsel renewed his objection on the record and made a motion for a mistrial, which

appears to have been denied. (T. 211.)  It is difficult to imagine how defense counsel could have

been more vigilant with respect to this issue.  See generally Fu v. Costello, No.

03CIV5746(LAK)(GWG), 2004 WL 2053254, at *14 (S.D.N.Y. Sept. 14, 2004) ("[B]ecause this

testimony was not improper bolstering under State law, [defense counsel] cannot have been

ineffective in failing to object to it."), adopted, 2004 WL 2847855 (S.D.N.Y. Dec. 10, 2004).

### b. Failure to seek definitive rulings or curative instructions

Petitioner next argues that counsel failed to seek a definitive ruling or curative instructions

with regard to two motions for mistrial, thus failing to preserve these issues for appeal. (Pet. Supp.

Br. at 24-25.)  The first motion pertained to Detective Cayea's testimony.  On cross-examination,

defense counsel elicited testimony that Rodriguez had told Cayea that the three perpetrators

entered the store wearing bandanas, in contrast to Rodriguez's  testimony at trial that petitioner

covered his face as he demanded the money at the cash register. (T. 206.)  The prosecutor was then

permitted, on redirect, to ask Cayea whether Rodriguez said anything further, to which he

responded that Rodriguez added that one of the men put his bandana on as he was coming into the

store. (T. 206-08.)  Defense counsel objected and moved for a mistrial on the ground that after the

defense put in Rodriguez's prior inconsistent statement, the prosecutor should not have been

allowed to offer a prior consistent statement. (T. 212.)  Apparently relying on the doctrine of

---

[15]  Sidebar conversations during trial were off the record and not transcribed.

completeness, the court noted that both comments were part of the same account that Rodriguez had given to the detective. (T. 213.) The court ultimately reserved decision as to the motion for a mistrial. (T. 215.) Petitioner now argues that defense counsel "never pursued the court for a ruling," and therefore "fail[ed] to preserve this issue for appellate review." (Pet. Supp. Br. at 25.)

Petitioner cannot show that he was prejudiced by defense counsel's failure to pursue a ruling on this motion, as the motion was without merit. Pursuant to the doctrine of completeness, "[w]here only a part of a statement is drawn out on cross-examination, the other parts may be introduced on redirect examination for the purpose of explaining or clarifying that statement." People v. Torre, 42 N.Y.2d 1036, 1037 (1977) (where witness testified that defendant had kicked him, and prosecution impeached witness with grand jury testimony in which he made no reference to the incident, defense on redirect properly offered further grand jury testimony that included statements about the incident); see also People v. Mejia, 739 N.Y.S.2d 42, 43 (1st Dep't 2002) (after defense counsel impeached eyewitness to shooting with a purportedly inconsistent prior remark in a statement to a detective about the number of shots witness had heard, "the court properly permitted the prosecutor to elicit other statements that the witness had made to the detective as recorded in the statement in order to place the inconsistency in context."); People v. Bailey, 726 N.Y.S.2d 389, 390 (1st Dep't 2001) (after prosecution witness was impeached with prior inconsistent statement contained in police report, the court properly permitted prosecution to elicit clarifying testimony and to introduce the next sentence of the same police report in order to place the alleged inconsistent statement in context).

In the instant case, Rodriguez's statement to Cayea that petitioner covered his face when he entered the store was properly elicited by the prosecutor in order to clarify and place in context

Rodriguez's statement to Cayea, adduced on cross-examination, that all three perpetrators walked in wearing bandanas.[16] Given the propriety of the prosecutor's redirect examination, there was no basis for granting defense counsel's motion for mistrial. Therefore, counsel's failure to pursue a ruling on the motion provides no support for Stallings' claim of ineffective assistance.

The second mistrial motion to which petitioner refers relates to the prosecutor's cross-examination of Ky'al Gordon, during which the prosecutor elicited testimony that Gordon did not go to the police even though she "knew [she] had important information regarding this case," and that Gordon never testified in the grand jury. (T. 267-68.) Defense counsel objected to the cross-examination as "improper" because the witness had no duty to talk to the police or to testify before a grand jury, and counsel asked for a mistrial on that basis. (T. 272-73.) After the prosecutor argued that the inquiry was relevant to the witness' credibility, the judge denied the motion for a mistrial. (T. 273.) Petitioner claims that defense counsel "failed to seek further relief in the form of curative instructions, thereby failing to preserve this issue for independent appellate review." (Pet. Supp. Br. at 24.)

Petitioner cannot show that counsel's conduct in this regard was deficient, as the testimony was properly admitted. Under New York law, a prosecutor may, under certain circumstances, impeach a defense witness by inquiring about the witness' failure to have volunteered exculpatory evidence to the authorities. Otero v. Eisenschmidt, No. 01 Civ.2562 HB AJP, 2004 WL 2504382, at *24 (S.D.N.Y. Nov. 4, 2004) (citing People v. Dawson, 50 N.Y.2d 311, 317-18 (1980)). Where the witness is a close friend of the defendant, was aware of the

---

[16]Notably, while generally consistent with Rodriguez's testimony that he was able to observe petitioner's face, the out-of-court statement that petitioner challenges is somewhat inconsistent with Rodriguez's trial testimony that "when [petitioner] hit me with the pistol that's when he lowered [the bandana] down to cover his face." (T. 154.)

charges pending, knew she possessed exculpatory information, and had the means to provide this information to the police, one would expect that "the natural impulse of [such] a person . . . would be to come forward at the earliest possible moment in order to forestall the mistaken prosecution . . . ." Dawson, 50 N.Y.2d at 318. In these circumstances, it is proper for the prosecution to suggest that the witness' "failure to speak up . . . might well cast doubt upon the veracity of the witness' exculpatory statements at trial." Id. (explaining that, in such situations, the failure to speak up "may be analogized to a 'prior inconsistent statement' by the witness.").

In this case, the prosecutor's questioning of Gordon was carefully designed to lay a proper foundation, as required by *Dawson*, to impeach her with evidence of her prior silence. The prosecutor established that Gordon and petitioner were close friends (T. 264); that petitioner called her a couple of days after the robbery to tell her he had been arrested (T. 263); that she knew that her observation of the robbers, whom she claimed did not resemble petitioner, would be helpful to him (T. 267); and that she knew where the police precinct was located. (T. 268.) Accordingly, it was entirely appropriate for the prosecution to suggest that Gordon's failure to come forward with exculpatory evidence on petitioner's behalf cast doubt on her truthfulness.

After defense counsel's motion for a mistrial was properly denied, he failed to request a curative instruction. However, as the Second Circuit has expressly held, "*Dawson* does not mandate that trial counsel seek such an instruction . . . [and] [c]ounsel's failure to make such a request did not rise to the level of constitutional ineffectiveness." Cuevas v. Henderson, 801 F.2d 586, 591 (2d Cir. 1986). Therefore, petitioner's argument is unavailing.

### c. Failure to seek a *Rodriguez* hearing[17]

---

[17] In New York, a *Rodriguez* hearing is held in lieu of a *Wade* hearing when the prosecution

(continued...)

Petitioner argues that his trial counsel erred by moving for a *Wade* hearing, rather than a *Rodriguez* hearing, to challenge the admissibility of Rodriguez's identification of him. However, counsel's decision constituted good trial strategy under the circumstances. A defendant seeking to suppress an identification on the ground that it was obtained through impermissible police procedures is presumptively entitled to a *Wade* hearing to "determine whether any police suggestiveness tainted the identification procedure." People v. Dixon, 85 N.Y.2d 218, 225 (1995). At the hearing, the prosecution must "establish the reasonableness of the police conduct and the lack of suggestiveness of the pretrial identification procedures." People v. Jackson, 484 N.Y.S.2d 913, 915 (2d Dep't 1985). If it cannot do so, and the defendant establishes that the identification "was so impermissibly suggestive as to deny the defendant due process of law," the burden shifts back to the prosecution to demonstrate "by clear and convincing evidence that the eyewitness' in-court identification of defendant [will be] based upon a source independent of the tainted procedure." Id.

The trial court may dispense with a full *Wade* hearing, however, where the prosecution alleges that the an identifying witness and the defendant are known to each other, "because that witness will naturally be 'impervious to police suggestion,'" and the risk of misidentification is therefore slight. Dixon, 85 N.Y.2d at 224 (quoting People v. Rodriguez, 79 N.Y.2d 445, 455 (1992)). The court may instead merely require the prosecution, at a so-called *Rodriguez* hearing, to provide evidence of the extent of the relationship between the witness and defendant. See People v. Quinones, 773 N.Y.S.2d 671, 671 (4th Dep't 2004) ("The purpose of a *Rodriguez*

---

[17](...continued)
alleges that, by virtue of a prior relationship between a witness and the defendant, the witness is "impervious to police suggestion," and her identification is therefore untainted by an otherwise suggestive pretrial identification procedure. People v. Rodriguez, 79 N.Y.2d 445, 452 (1992).

hearing is to establish that an identification is confirmatory when the court denies a request for a *Wade* hearing on that basis.").

The prosecutor alleged in this case that a *Wade* hearing was unnecessary because Rodriguez knew Stallings from prior incidents.[18] By successfully moving for a *Wade* hearing despite the prosecutor's protest, defense counsel forced the prosecution to produce evidence beyond that which it would have had to disclose at a more circumscribed *Rodriguez* hearing. To the extent that petitioner is concerned that he did not have the opportunity to confront Rodriguez at the hearing, he would not have been guaranteed that opportunity at a *Rodriguez* hearing, at which the prosecution is not obligated to call the identifying witness. See People v. Espinal, 693 N.Y.S.2d 534, 535 (1st Dep't 1999) ("The prosecution had no obligation to call the identifying witness [at a *Rodriguez* hearing] and properly established [the witness' familiarity with defendant] through the testimony of a police detective . . . ."). Thus, defense counsel's demand for a *Wade* hearing was not ineffective, and petitioner suffered no prejudice whatsoever.

### d. Inadequate cross-examination

Petitioner next argues that his trial counsel was ineffective for failing to conduct adequate cross-examinations of Detective Cayea, the only witness at the *Wade* hearing, and of Rodriguez at trial.

Decisions about the scope and manner of cross-examination are considered "strategic in nature and generally will not support an ineffective assistance claim." Dunham v. Travis, 313 F.3d 724, 732 (2d Cir. 2002) (internal quotation marks and citation omitted); see also United States v.

_____

[18] Prior the start of the *Wade* hearing, the prosecution again questioned its necessity, stating that the defendant "has had two prior cases with the same complaining witness and knows him, knows him by name." (H. 3.)

Luciano, 158 F.3d 655, 660 (2d Cir. 1998) ("[T]he conduct of examination and cross-examination is entrusted to the judgment of the lawyer," and a court "should not second-guess such decisions unless there is no strategic or tactical justification for the course taken."); Mendez v. Connolly, No. 05 Civ. 1979(DC), 2006 WL 464045, at *8 (S.D.N.Y. Feb. 23, 2006) ("A decision on what questions to ask during cross examination is a strategic decision and should be viewed deferentially.").

Petitioner argues that, during cross-examination of Cayea at the suppression hearing, counsel should have minimized Rodriguez's prior familiarity with petitioner by eliciting testimony showing that "the contact between [petitioner] and Rodriguez was distant," and that "there was no emergency and little urgency warranting the showing of a single photo of the [petitioner]." (Pet. Supp. Br. at 17.) However, on direct examination, Cayea testified that Rodriguez had given police two orders of protection against petitioner for criminal mischief and told them that he continued to see petitioner on several occasions outside his store. (H. 6, 9-10.) Given this testimony, counsel may well have determined that it would have been futile to argue that Rodriguez had not retained a sufficient memory of petitioner to be able to readily identify him. Consequently, rather than arguing that Rodriguez was susceptible to the suggestiveness inherent in the single-photo procedure, counsel sought to lay the foundation for a defense theory, later developed at trial, that Rodriguez falsely identified petitioner as one of the robbers in retaliation for past incidents. To this end, he elicited testimony that Rodriguez had told the detective that the perpetrators entered the store with their faces covered, that Rodriguez failed to identify petitioner by name or describe his physical characteristics immediately after the robbery, and that he waited two days before going to the police with the orders of protection and telling them that he recognized petitioner

during the robbery from a scar on his face. (H. 11-15.) Counsel's decision to pursue this avenue of cross-examination constituted sound strategy.[19]

Petitioner also faults counsel's cross-examination of Rodriguez at trial. Many of his arguments are flatly contradicted by the record. First, petitioner argues that counsel should have questioned Rodriguez on the inconsistencies in his testimony regarding when he first saw the scar on the perpetrator's face. (Pet. Supp. Br. at 18-19.) Counsel in fact spent a great deal of time questioning Rodriguez on this issue. He elicited inconsistencies between Rodriguez's trial and grand jury testimony regarding when he first observed the scar (T. 157-59), and established that Rodriguez failed to mention the scar when he initially spoke to the police following the robbery, even though he described the perpetrator's clothing. (T. 165.) During summation, counsel reiterated these points and argued that, if Rodriguez did not in fact see the scar on the perpetrator's face earlier in the day, then he could not have recognized him during the robbery *because* of this characteristic, even assuming the perpetrator's face was uncovered. (T. 318-19.) Counsel smartly drew upon questionable aspects of Rodriguez's testimony to zealously advocate a consistent defense.

Next, petitioner complains that counsel failed to elicit testimony that Rodriguez "had described two of the [perpetrators] as wearing blue jeans and blue jackets, which would have cast doubt as to the reliability of his identification of [petitioner]." (Pet. Supp. Br. at 19.) Rodriguez did, in fact, testify to these observations on direct examination, noting that petitioner was wearing

---

[19]  Counsel did make a short argument regarding the suggestiveness of the photo procedure before the close of the hearing, stating, "I would just argue that the photo identification was one single photograph, and I would argue that it is suggestive, and I would ask that it be suppressed." (H. 16.) In addition, as explained *supra* note 6, while the court permitted Rodriguez's in-court identification, it sustained objections during trial to evidence of the pretrial identification procedure. (T. 201-02.)

a blue Yankees jacket and blue jeans and that one of the other men was "dressed with jeans and a blue coat also." (T. 134.) There was nothing further for defense counsel to elicit on cross with respect to this observation. Defense counsel argued, during summation, that Yankees jackets are so ubiquitous in the New York area that this article of clothing is an unreliable identifying characteristic. (T. 318.) He dutifully put forth a colorable argument, and the jury was free to draw its own conclusions regarding Rodriguez's identification.

Third, petitioner argues that counsel should have impeached Rodriguez with his "prior inconsistent statement to the police," purportedly contained in Defense Exhibit A for identification, after Rodriguez denied on cross-examination that he had told Officer Wimpelberg that all of the perpetrators were "unknown to him personally." (Pet. Supp. Br. at 20.)[20] The record shows that, in a prior exchange during cross-examination, after Rodriguez could not recall having told Officer Wimpelberg that "the man with the Yankee jacket had a black hat on," defense counsel attempted to confront him with Defense Exhibit A, presumably the officer's report containing such a description. (T. 162-64.) Rodriguez, who testified through a Spanish interpreter (see, e.g., T. 128-29), responded that he could not read the document as it was in English. (T. 163-64.) Unable

to confront Rodriguez with the written report, counsel resumed questioning Rodriguez about how he had described the perpetrators to the officer. (T. 164-65.)

Petitioner cannot establish that his counsel's conduct fell below an objective standard of

---

[20] Petitioner refers to the following exchange on cross-examination:
> Q: Did you tell Officer Wimpelberg that all three individuals were unknown, yes or no?
> A: No, they were two unknown and him who I knew.
> COURT: No, please, the answer is no, he didn't tell that to the officer.
> WITNESS: No.

(T. 167-68.)

reasonableness. Counsel attempted to impeach Rodriguez with a police report that purportedly contained prior inconsistent statements (including, presumably, one that suggested that all three robbers were strangers to him). Counsel's inability to use the document was due to circumstances beyond his control, and does not render his representation ineffective. Furthermore, petitioner was not prejudiced by that omission. Defense counsel established on cross-examination that Rodriguez made prior inconsistent statements to the grand jury, did not give Officer Wimpelberg a good description of petitioner after the robbery, and did not tell him, when first questioned, that he had petitioner's name at home. (T. 157-60, 176-80, 182.) Counsel further elicited that Rodriguez "had a problem with" petitioner in the past, thereby establishing motive to lie. (T. 183.) The jury thus was well aware of the potential problems with Rodriguez's story and was well-equipped to make informed credibility determinations.

Petitioner's remaining arguments with respect to counsel's cross-examination of Rodriguez are similarly without merit. First, he contends that counsel should have impeached Rodriguez's credibility with regard to his testimony that the video surveillance camera in the store was not working the day of the robbery by asking him whether it was working the day before and the day after. (Pet. Supp. Br. at 20.) It is merely speculative, however, whether Rodriguez would have testified that the camera was working on those days, and whether the jury would have drawn an inference favorable to the defense from such testimony. Therefore, petitioner cannot show that he was prejudiced by counsel's failure to pursue this line of questioning.

Finally, petitioner argues that counsel "opened the door to highly prejudicial testimony about Rodriguez's previous orders of protection" against petitioner by questioning Rodriguez about what he told police after the robbery. (Pet. Supp. Br. at 20-21.) In order to support the

argument that Rodriguez fabricated petitioner's involvement in the robbery, defense counsel sought to elicit testimony from Rodriguez on cross-examination to the effect that he did not immediately tell police that he knew one of the perpetrators. The question was carefully worded to avoid mentioning of the orders of protection, and defense counsel objected appropriately when Rodriguez gave an unsolicited answer referencing them.[21] It was the prosecutor, on redirect, who questioned Rodriguez directly about the orders of protection, and defense counsel responded by objecting and requesting a sidebar. (T. 189.) The judge apparently overruled the objection at the sidebar and permitted the prosecutor to proceed with her questioning. (T. 189-93.)

Defense counsel thereafter crafted an argument on summation that the prior incidents supplied a motive for Rodriguez to blame petitioner. (T. 320.) Defense counsel's performance was objectively reasonable under these circumstances. Furthermore, any prejudice petitioner may have suffered from the introduction of the evidence was mitigated by the judge's limiting instruction that, "under no circumstance are you to consider the fact that the defendant has previously had orders of protection issued against him and in favor of Junior Rodriguez as proof that he necessarily committed any of the crimes with which he is charged in this case." (T. 345.)

### e. Failure to contact potential defense witness

Petitioner also claims that trial counsel was ineffective because he failed to interview and call an eyewitness who may have provided exculpatory testimony. (T. 25-26.) He argues that Patricio Garcia, an employee of the bodega who was present during the robbery, "may well have

---

[21] When defense counsel asked Rodriguez whether he had told the police, upon their arrival at the scene of the robbery, that although he could not remember petitioner's name he had it written down at home (T. 182), Rodriguez answered with the following statement: "The police asked me when I had the letter of protection to bring it to the bodega to wait for the detectives. He told me he would return." (T. 182-83.) The transcript indicates that the judge then sustained an objection to this response and instructed the witness to answer simply "yes or no." (T. 183.)

testified that all of the men entered the bodega with their faces covered" (Pet. Supp. Br. at 25), thus undermining Rodriguez's testimony that petitioner did not cover his face until after he was in the store.

An attorney's decision regarding "whether to call specific witnesses–even ones that might offer exculpatory evidence–is ordinarily not viewed as a lapse in professional representation." United States v. Best, 219 F.3d 192, 201 (2d Cir. 2000) (internal quotation marks and citation omitted). Such decisions "fall squarely within the ambit of trial strategy, and, if reasonably made, will not constitute a basis for an ineffective assistance claim." United States v. Nersesian, 824 F.2d 1294, 1321 (2d Cir. 1987); see also Sweat v. United States, No. 05-CV-221, 2005 WL 3179672, at *7 (S.D.N.Y. Nov. 29, 2005) ("Habeas claims based on complaints of uncalled witnesses are not favored, because the presentation of testimonial evidence is a matter of trial strategy and because allegations of what a witness would have testified [to] are largely speculative.") (internal quotation marks and citation omitted); Muhammad v. Bennett, No. 96CIV.8430(JSR)(HBP), 1998 WL 214884, at *1 (S.D.N.Y. Apr. 29, 1998) ("[P]etitioner's speculative claim about the testimony of an uncalled witness" could not sustain ineffective assistance of counsel claim).

Defense counsel's decision not to pursue Garcia as a witness was plainly reasonable in the face of clear evidence that his testimony would have been highly incriminating. As petitioner notes in his own appellate brief, the prosecution served the defense with disclosure that on October 19, 1999, Garcia viewed a photograph and identified petitioner as one of the robbers. (Pet. Supp. Br. at 15-16.) It is difficult to fathom how petitioner faults his attorney for failing to seek as a "defense witness" someone who might well have identified him in court as one of the robbers. Moreover, petitioner proffers no affidavit from Garcia concerning his observations during the

robbery.  Stallings therefore provides no basis for speculating that Garcia (who presumably saw the face of one of the robbers) would have testified that all three perpetrators entered the bodega with their faces covered, much less that such testimony would have resulted in his acquittal. See Sweat, 2005 WL 3179672, at *8 ("Petitioner cannot demonstrate that *but for* the absence of [the uncalled witness'] testimony, the result of the trial would have been different.") (emphasis in original); Ozuru v. United States, No. 95 CV 2241, 1997 WL 124212, at *4 (E.D.N.Y. Mar. 11, 1997) (because the testimony of uncalled witnesses "may have as likely exposed inconsistencies and weaknesses in defendant's case as have lent support to Petitioner's defense," defendant's conclusory allegations about the testimony of such witnesses were insufficient to demonstrate prejudice).

In sum, because petitioner cannot satisfy the deficiency or prejudice prongs of *Strickland*, the Appellate Division did not act unreasonably in rejecting his claim of ineffective assistance of counsel.

### F.  Excessive Sentence

Finally, petitioner claims that his sentence of two ten-year prison terms and two seven-year terms, to run concurrently, is excessive.  Respondent argues, and this Court agrees, that petitioner has not exhausted his federal habeas claim in state court. (Memorandum in Opposition to Petition for a Writ of Habeas Corpus, at 8-10.)

A federal court may not grant the habeas petition of a state prisoner unless the applicant "has exhausted the remedies available in the courts of the State; or there is an absence of available State corrective process; or circumstances exist that render such process ineffective to protect the rights of the applicant." 28 U.S.C. § 2254(b)(1).  In order to satisfy the statute's exhaustion requirement, a petitioner must first give the state courts "a fair opportunity to pass upon his federal

claim." Daye v. Att'y Gen., 696 F.2d 186, 191 (2d Cir. 1982) (citing Picard v. Connor, 404 U.S. 270, 275 (1971)). This requirement is not satisfied unless the petitioner has "fairly presented" the claim in a manner that has "informed the state court of both the factual and the legal premises of the claim he asserts in federal court." Daye, 696 F.2d at 191-92; see also Young v. Senkowski, No. 02 Civ. 10213 (RCC)(THK), 2006 WL 464056, at * 4 (S.D.N.Y. Feb. 24, 2006) (a petitioner "must 'fairly present' to the appropriate state courts a claim for relief that is 'in substance' the same as that requested in the habeas corpus petition, so as to give the state courts a 'full and fair opportunity to resolve the claim on the merits.'") (internal citations omitted). While a petitioner need not "cit[e] chapter and verse of the Constitution," he must demonstrate "(a) reliance on pertinent federal cases employing constitutional analysis, (b) reliance on state cases employing constitutional analysis in like fact situations, (c) assertion of the claim in terms so particular as to call to mind a specific right protected by the Constitution, [or] (d) allegation of a pattern of facts that is well within the mainstream of constitutional litigation." Daye, 696 F.2d at 194.

Stallings' petition to the Appellate Division requested that the court exercise its discretion to reduce his sentence "in the interest of justice," a reference to a New York statute that permits the Appellate Division to modify a legal but unduly harsh sentence in the "interest of justice." N.Y. Crim. Proc. Law § 440.15. Neither the petitioner's language, nor the case he cites, People v. Suitte, 90 A.D.2d 80, 86 (2d Dep't 1982), suggests the federal nature of the claim. See Medina v. Greene, No. 03 Civ. 8646(DC), 2004 WL 2809196, at *4 (S.D.N.Y. Dec. 7, 2004) (where petitioner appealed to Appellate Division's "interest of justice" power, he "did not fairly present the excessive sentence claim in federal constitutional terms."); Rivera v. Greiner, 272 F.Supp.2d 197, 201 (E.D.N.Y. 2003) (where "petitioner, in seeking a reduction of sentence, invoked only the

Appellate Division's unique discretion to modify legal sentences in the interests of justice," the claim was unexhausted).

Petitioner's failure to exhaust his excessive sentence claim does not, however, prevent this Court from denying it on the merits. AEDPA provides that a federal habeas court has the discretion to deny an application for a writ of habeas corpus "notwithstanding the failure of the applicant to exhaust the remedies available in the courts of the State." 28 U.S.C. § 2254(b)(2); see, e.g., Guerrero v. Artuz, No. 00 CIV.2305(AKH), 2002 WL 619576, at *2 (S.D.N.Y. April 17, 2002) (denying excessive sentence claim on the merits despite petitioner's failure to exhaust it). The majority of district courts in this circuit have exercised their discretion to deny unexhausted claims when they are "patently frivolous." See Naranjo v. Filion, No. 02Civ.5449WHPAJP, 2003 WL 1900867, at *8 (S.D.N.Y. April 16, 2003) (collecting cases).

Here, it is undisputed that petitioner's sentence was within the range prescribed by state law. Stallings was convicted of two counts of Robbery in the First Degree, a Class B Violent Felony, for which the statutory sentencing range is five years to 25 years' imprisonment, N.Y. Penal Law § 70.02(3)(a), and two counts of Robbery in the Second Degree, a Class C Violent Felony, which carries a sentencing range of three and one-half years to 15 years. N.Y. Penal Law § 70.02(3)(b). He received a sentence of ten years' incarceration on each of the first degree robbery counts, and seven years' incarceration on each of the second degree robbery counts, to run concurrently. (S. 8.)

While petitioner claims that his ten-year sentence was excessive in light of his personal background (Petition at ¶ 13), he does not contend that the sentence was "grossly disproportionate to the severity of the crime," Rummel v. Estelle, 445 U.S. 263, 271 (1980), or that his liberty was violated by the sentencing court's "arbitrary or capricious abuse of discretion . . . ." Jones v.

Hollins, 884 F.Supp. 758, 762 (W.D.N.Y. 1995) (internal citations omitted), aff'd, 89 F.3d 826 (2d Cir. 1995). As his sentence falls well within the range established by state statutory law, no constitutional issue is presented for habeas review. See White v. Keane, 969 F.2d 1381, 1383 (2d Cir. 1992); accord Yapor v. Mazzuca, No. 04Civ.7966 RCCAJP, 2005 WL 1845089, at *6 (S.D.N.Y. Aug. 3, 2005); Herrera v. Artuz, 171 F.Supp.2d 146, 151 (S.D.N.Y. 2001); Thomas v. Senkowski, 968 F.Supp. 953, 956 (S.D.N.Y. 1997).

## CONCLUSION

For the foregoing reasons, Sean Stallings' petition for a writ of habeas corpus is denied. No certificate of appealability is granted with respect to any of petitioner's claims, as petitioner has made no substantial showing of any denial of his constitutional rights. Petitioner has a right to seek a certificate of appealability from the United States Court of Appeals for the Second Circuit. See 28 U.S.C. § 2253; Miller-El v. Cockrell, 537 U.S. 322 (2003).

The Clerk is directed to docket this Memorandum and Order via electronic case filing, to close the case, and to mail a copy to *pro se* petitioner, Sean Stallings, #01A1360, at State Route 96, P.O. Box 119, Romulus, New York 14541.

**SO ORDERED.**

**Dated: Brooklyn, NY**
**March 27, 2006**


**ROANNE L. MANN,**
**UNITED STATES MAGISTRATE JUDGE**